UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

DAVID MOLNER,

               *Plaintiff*,

    -against-

REED SMITH LLP, JAMES C.
MCCARROLL, GEOFFREY VARGA,
JAMES L. SANDERS, FRANCISCA MOK,
KURT GWYNNE, JORDAN W. SIEV,
DAVID BREE, ROGER HANSON,
DONALD M. SEYMOUR, JESS
SHAKESPEARE, KINETIC PARTNERS,
DUFF & PHELPS, LLC & DMS
GOVERNANCE LTD.,

               *Defendants*.

--------------------------------------------------------x

Case No. 20-cv- 8760

## NOTICE OF REMOVAL

      PLEASE TAKE NOTICE that, pursuant to §§ 1334(b), 1446 and 1452(a) of title 28 of

the United States Code, and Rule 9027 of the Federal Rules of Bankruptcy Procedure (the

"***Bankruptcy Rules***"), defendant Reed Smith LLP ("***Reed Smith***"), by and through its

undersigned counsel, hereby removes this action from the Supreme Court of the State of New

York, County of New York (Index Number 154198/2020) (the "***State Action***"), to the United

States District Court for the Southern District of New York.  Reed Smith requests that the

removed State Action be referred to the United States Bankruptcy Court for the Southern District

of New York (the "***Bankruptcy Court***") pursuant to this Court's *Amended Standing Order of*

*Reference* dated January 31, 2012 (the "***Standing Order***"), attached as **Exhibit 1**.[1]

---

[1]   The Standing Order provides that "any or all cases under title 11 and any or all proceedings arising under title
   11 or arising in or related to a case under title 11 are referred to the bankruptcy judges for this district."

A copy of the Summons with Notice (the "**Summons**") filed by plaintiff David Molner ("**Molner**") in the State Action, which Molner states he served on Reed Smith on October 6, 2020,[2] is attached as **Exhibit 2**.[3]  Molner's Summons describes claims against various professionals related to and arising from (*i.e.*, "arising in") certain chapter 11 bankruptcy cases commenced in 2014 and thereafter.  *See In re Aramid Entertainment Fund Limited, et al.*, Case No. 14-11802 (Bankr. S.D.N.Y.) (the "**Chapter 11 Cases**").[4]  These professionals, who were approved by the Bankruptcy Court, include the "joint voluntary liquidators"[5] for Aramid Entertainment Fund Limited ("**Aramid**") and certain of its affiliates (together with Aramid, the "**Debtors**") and the Debtors' counsel.[6]

Molner, who is the Debtors' former manager, essentially alleges that the professionals harmed him and two of his affiliated entities by:

(1)       commencing the Chapter 11 Cases in bad faith as part of a fraudulent scheme to usurp control of the Debtors from Molner, although Molner and his entities never filed a motion to dismiss the Chapter 11 Cases for bad faith nor raised such concerns in the Bankruptcy Court despite Molner's active involvement in the Chapter 11 Cases over many years;

---

[2]   A copy of the Proof of Service is attached as **Exhibit 4**.  By filing this Notice of Removal, Reed Smith reserves all rights regarding the adequacy of service of the Summons.

[3]   *See Cal. Pub. Emps.' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 103 (2d Cir. 2004) ("[B]ecause any *one* 'party' can remove under Section 1452(a), removal under that provision, unlike removal under Section 1441(a), does not require the unanimous consent of the defendants." (emphasis in original)); *see also Lothian Cassidy, LLC v. Lothian Expl. & Dev. II, L.P.*, 487 B.R. 158, 161 n.2 (S.D.N.Y. 2013) (same); *In re Refco, Inc. Sec. Litig.*, 628 F. Supp. 2d 432, 435 n.2 (S.D.N.Y. 2008) (same); *Mt. McKinley Ins. Co. v. Corning, Inc.*, 2003 WL 1482786, at *6 (S.D.N.Y. Mar. 21, 2003) (same), *vacated on different grounds*, 399 F.3d 436 (2d Cir. 2005).

[4]   The Chapter 11 Cases are consolidated for procedural purposes only and are currently pending before the Honorable Sean H. Lane.  All references herein to the docket in the Chapter 11 Cases refer to the lead Chapter 11 case of *In re Aramid Entertainment Fund Limited, et al.*, Case No. 14-11802 (SHL) (the "**Bankruptcy Docket**").

[5]   The joint voluntary liquidators named in the Summons are Geoffrey Varga and Jess Shakespeare, who are employees of Duff & Phelps, LLC, and were employees of its predecessor, Kinetic Partners.

[6]   The Debtors' counsel named in the Summons is Reed Smith, which is the removing defendant.  Individual partners of Reed Smith also named in the Summons are James C. McCarroll, Francisca Mok, James L. Sanders, Kurt Gwynne, and Jordan W. Siev.  By this Notice of Removal, Reed Smith does not purport to waive any defenses or arguments (including, without limitation, improper service and lack of personal jurisdiction) that it or any other defendant in the State Action may assert.

2

(2)      terminating, with the approval of the Bankruptcy Court, the Debtors' relationship

with Molner and the Debtors' contract with an entity controlled by Molner, thereby allegedly

depriving Molner of anticipated compensation from the Debtors during the Chapter 11 Cases;

(3)      receiving allegedly excessive compensation during the Chapter 11 Cases from the

Debtors and the Distribution Trust established to liquidate the Debtors' assets—compensation

that was publicly disclosed and paid pursuant to procedures established by, and orders of, the

Bankruptcy Court following notice to (and no objection by) Molner and his related entities; and

(4)      causing Molner to "have to pay millions" in legal expenses in connection with the

Chapter 11 Cases and an adversary proceeding brought by Aramid against Molner and his

entities in connection with the Chapter 11 Cases based on Molner's mismanagement of Aramid,

including taking "unearned and unbargained-for compensation" of "not less than **$40 million** in

fees over an eight year period of steady decline for [Aramid]"[7]—legal expenses that:

(A)      were part of three proofs of claim filed by Molner and his related entities in the

Chapter 11 Cases, two of which were expunged with prejudice pursuant to an order of the

Bankruptcy Court and the third of which remains pending in the Chapter 11 Cases; and

(B)      the Bankruptcy Court held must be adjudicated in the Chapter 11 Cases (not in

another proceeding) in connection with Molner's proofs of claim.

This Court has original jurisdiction over the State Action pursuant to 28 U.S.C. § 1334(b)

as "arising in or related to cases under title 11" of the United States Code—specifically, the

Chapter 11 Cases.  The Bankruptcy Court has also entered an order expressly "retain[ing]

exclusive jurisdiction with respect to all matters arising from or related to the Chapter 11

---

[7]   *See Aramid Entertainment Fund Limited v. David Molner, et al.*, Case No. 16-01025 (Bankr. S.D.N.Y. Feb. 9, 2016) (the "***Adversary Docket***"), Dkt. No. 1 at 4-5.

Cases,"[8] which necessarily includes the issues presented by the State Action.

## I.      OVERVIEW

### A.      Factual Overview

1.      The Debtors operated an investment fund organized under the laws of the Cayman

Islands that provided short and medium term liquidity to producers and distributors of media and

entertainment assets through loans, equity investments, and other financial investments.  For

several years leading up to the Chapter 11 Cases, Molner managed Aramid's affairs through

Aramid Capital Partners, LLP ("*ACP*"), an entity that he controlled, pursuant to a Services

Provision Agreement between ACP and Aramid (the "*ACP Services Agreement*").

Approximately one month before the commencement of the Chapter 11 Cases, the parties

consensually terminated the ACP Services Agreement.  Molner thereafter continued to manage

Aramid through a different entity that he controlled, Asset Resolution Partners, Ltd. ("*ARP*"),

pursuant to an agreement between ARP and Aramid (the "*ARP Services Agreement*").

2.      On June 13, 2014 (the "*Petition Date*"), the Debtors commenced the Chapter 11

Cases by filing voluntary petitions for relief (the "*Petitions*") in the Bankruptcy Court.  That

same day, Geoffrey Varga and Jess Shakespeare of Kinetic Partners asked the Bankruptcy Court

to authorize them to serve as the Debtors' "joint voluntary liquidators" in the Chapter 11 Cases

(in such capacity, the "*JVLs*").  As JVLs, Varga and Shakespeare were responsible for winding

up the Debtors' affairs under the laws of the Cayman Islands.  Reed Smith concurrently asked

the Bankruptcy Court to authorize them to serve as the Debtors' bankruptcy counsel.

3.      Notice of the commencement of the Chapter 11 Cases was served

contemporaneously on Molner, and Molner admits in the Summons that he knew about the

---

[8]   Bk. Dkt. No. 710 at 43, 97-98.

Chapter 11 Cases on June 14, 2014, one day after the Petition Date.[9]  After notice to parties in interest, including Molner, on October 3, 2014, the Bankruptcy Court entered orders approving the Debtors' retention of the JVLs and Reed Smith *nunc pro tunc* to the Petition Date.  Although Molner now alleges in the State Action that the JVLs and Reed Smith improperly commenced the Chapter 11 Cases without Molner's consent as part of a scheme to defraud Molner, and that Molner was aware of the purported fraud one day after the Petition Date, Molner and his entities did not move to dismiss the Chapter 11 Cases as having been filed in bad faith, object to the employment of the JVLs or Reed Smith, or otherwise raise these or any other such concerns in the Bankruptcy Court.

4.      The JVLs received compensation from the Debtors pursuant to an order of the Bankruptcy Court that required the JVLs to submit their monthly invoices to the United States Trustee and also required the Debtors to publicly disclose (including to Molner) any payments to the JVLs in monthly operating reports filed in the Chapter 11 Cases.  Reed Smith filed all of its monthly fee statements as part of its "interim fee applications" to the Bankruptcy Court, and applications requesting approval of the compensation paid to Reed Smith were served on Molner individually and/or on behalf of ARP.

5.      Between June 2014 and February 2016, the Debtors filed 21 monthly operating reports disclosing all payments to the JVLs, and Reed Smith filed 20 monthly fee statements, five interim fee applications, and an application for approval of Reed Smith's fees in connection with a contingency fee matter on behalf of the Debtors.  The Bankruptcy Court entered five separate orders approving the interim fee applications and another order approving the contingency fee, and ultimately granted a "final fee application" approving the compensation

---

[9]  *See* Summons at 6.

paid to Reed Smith.  Despite now alleging in the State Action that the compensation paid to the

JVLs and Reed Smith was excessive, Molner and his entities never filed any objection to, or

otherwise opposed, the compensation paid to the JVLs or Reed Smith during the Chapter 11

Cases, all of which was disclosed to all parties in interest, including Molner.

6.     The Debtors identified as an impetus for the Chapter 11 Cases a years-long,

expensive litigation campaign launched by Molner against several targets that had yielded no

meaningful benefit to the Debtors (the "***Molner Litigation Campaign***").  In October 2014, the

Debtors filed a motion requesting the Bankruptcy Court's authorization to terminate their

relationship with Molner by rejecting the ARP Services Agreement.  That motion was served on

Molner on behalf of ARP.  The Bankruptcy Court later entered an order granting the motion,

finding that the rejection of the ARP Services Agreement was in the best interest of the Debtors'

estates.  Despite alleging in his Summons that the JVLs and Reed Smith improperly "fired"

Molner during the Chapter 11 Cases (*i.e.*, by rejecting the ARP Services Agreement), Molner

and his entities never filed an objection to, nor otherwise opposed, the Debtors' motion to reject

the ARP Services Agreement, despite the opportunity to do so.

7.     In December 2014, Molner, ACP and ARP each filed a proof of claim against the

Debtors in the Chapter 11 Cases (the "***Molner Claim***," "***ACP Claim***," and "***ARP Claim***,"

respectively).  The ARP Claim, in the amount of $2,016,250, included over $1 million in unpaid

fees and expenses pursuant to the ARP Services Agreement for the period following the Petition

Date, and a claim for indemnification from the Debtors with respect to any legal expenses that

allegedly were owed or would become owed to ARP "relating to [its] involvement with . . . these

Chapter 11 Cases" or the Molner Litigation Campaign.[10]  The Molner Claim, in an amount not

---

[10]   Bk. Dkt. Claim No. 42.

less than $1,000,000, and the ACP Claim, in an amount not less than $2,365,950.50, both requested reimbursement and/or indemnification from the Debtors regarding legal expenses that allegedly were owed or would become owed to Molner and ACP, respectively, "relating to [his/its] involvement with . . . these Chapter 11 Cases" or the Molner Litigation Campaign.[11]

8.      On October 30, 2015, the Debtors filed objections to the Molner Claim, the ACP Claim, and the ARP Claim with the Bankruptcy Court.  On January 19, 2016, Molner and his entities responded to the Debtors' objections, including by making various allegations *in the Chapter 11 Cases* against Reed Smith.  Among those allegations were assertions that Reed Smith had "caused [Aramid] to incur enormous legal bills . . . with no apparent benefit to [Aramid]" and had tacitly approved the Molner Litigation Campaign.[12]  As discussed below, the claims of Molner and ACP were subsequently "held in abeyance pending final resolution" of an Arbitration (defined below) approved by the Bankruptcy Court, and the ARP Claim remained (and remains) a disputed claim in the Chapter 11 Cases.[13]

9.      On December 18, 2015, the Bankruptcy Court entered an order approving the First Amended Disclosure Statement (the "*Disclosure Statement*") with respect to the Joint Liquidating Plan of Reorganization (as amended, the "*Plan*") proposed by the Debtors.[14]  The Disclosure Statement noted that "the Debtors hold (or may hold) claims and causes of action against . . . Molner . . . ACP [and] ARP . . . relating to their involvement in or relating to the Molner Litigation and . . . the mismanagement of the Debtors' business, the taking of exorbitant fees (particularly in transactions that were of little or no benefit to the Debtors), and the

---

[11]   Bk. Dkt. Claim Nos. 41, 44.
[12]   Bk. Dkt. No. 644 at 15, 20-21; Bk. Dkt. No. 645 at 7-9.
[13]   Adv. Dkt. No. 16.
[14]   Bk. Dkt. No. 608.

commencement and conduct of the Molner Litigation and other claims and causes of action."[15]

Molner and his entities never filed an objection to the Disclosure Statement (even if only to

indicate that Molner disputed the Debtors' allegations); nor did they claim that the Chapter 11

Cases were filed as part of a fraudulent scheme.

10.     On February 9, 2016, Aramid commenced an adversary proceeding against

Molner and ACP related to the Chapter 11 Cases (the "***Adversary Proceeding***").[16]  The

Adversary Proceeding sought $150.5 million as damages from Molner and ACP due to their

mismanagement of the Debtors.  In May 2016, the parties to the Adversary Proceeding agreed to

arbitrate their dispute with the approval of the Bankruptcy Court (the "***Arbitration***").  They also

agreed that the claims of Molner and ACP "shall be held in abeyance pending final resolution" of

the Arbitration.[17]

11.     On February 19, 2016, the Bankruptcy Court entered an order approving the Plan

(the "***Confirmation Order***").  The Confirmation Order: (1) approved release and exculpation

provisions in the Plan that are expressly applicable to the JVLs and Reed Smith; (2) approved an

exhibit to the Plan that includes the ARP Services Agreement in a list of contracts the Debtors

had rejected; (3) approved the appointment of Varga and Shakespeare (who served as the JVLs

in the Chapter 11 Cases) as trustees of the Distribution Trust (in such capacity, the "***Distribution***

***Trustees***"); (4) authorized the Distribution Trustees to retain counsel for the Distribution Trust;

(5) authorized compensation of the Distribution Trustees and counsel to the Distribution Trust

pursuant to terms set forth in the Distribution Trust Agreement, which is an exhibit to and part of

the Plan; and (6) approved the provision of the Distribution Trust Agreement providing for

---

[15]  Bk. Dkt. No. 593 at 71.

[16]  ARP was not named as a defendant in the Adversary Proceeding; ARP only began providing services to the
Debtors just over one month before the Petition Date.

[17]  Adv. Dkt. No. 16.

indemnification of the Distribution Trustees and counsel to the Distribution Trust.  The

Distribution Trustees retained Reed Smith as counsel to the Distribution Trust.

12.     The Confirmation Order includes the Bankruptcy Court's determination that

"[t]he Debtors have proposed the Plan in good faith."[18]  The Bankruptcy Court could not have

issued a good faith determination, which is required to confirm a plan under the Bankruptcy

Code, if the Chapter 11 Cases were "unnecessary" or if the Plan furthered a fraudulent scheme

against Molner as he now alleges in the State Action.[19]  Notice regarding the objection deadline

and the hearing to consider confirmation of the Plan was served on Molner on behalf of ARP.

Molner and his related entities never filed an objection to, nor otherwise opposed, confirmation

of the Plan, including the Bankruptcy Court's good faith determination and the Plan's release

and exculpation provisions.

13.     The Plan became effective on February 25, 2016 (the "***Effective Date***").  On the

Effective Date, pursuant to the release and exculpation provisions in the Plan, the Debtors

released all claims against the Debtors' professionals, including the JVLs and Reed Smith.  As a

result, the JVLs and Reed Smith were protected from any claim by any individual or entity

(including Molner) regarding various events that occurred in the Chapter 11 Cases, except in

limited circumstances defined in the Plan (none of which has even arguable application to the

claims asserted by Molner in the State Action).

14.     Also on the Effective Date, the assets remaining in the Debtors' estates were

transferred to the Distribution Trust for liquidation and distribution to the Debtors' stakeholders

---

[18]  Bk. Dkt. No. 710 at 4, 17.
[19]  *See* 11 U.S.C. § 1129(a)(3); *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984) ("good faith has been found to be
      lacking if the plan was proposed for ulterior motives"); *In re Bd. of Directors of Telecom Argentina, S.A.*, 528
      F.3d 162, 174 (2d Cir. 2008) (good faith is lacking if a debtor pursues "a debt restructuring it knew was
      unnecessary").

in the manner set forth in the Plan and the Distribution Trust Agreement.  Pursuant to the

Confirmation Order and the Plan, the Distribution Trustees filed in the Chapter 11 Cases (and

served on Molner on behalf of ARP) annual reports for each year from 2016 to 2019 disclosing

the fees and expenses paid by the Distribution Trust to the Distribution Trustees and Reed Smith.

15.     Additionally, on the Effective Date, the Distribution Trust replaced Aramid as the

Claimant in the Arbitration.  Later, in January 2018, Molner filed a motion requesting that the

Bankruptcy Court permit the issue of whether Molner and his entities were entitled to

indemnification of their legal expenses, as requested in their proofs of claim, to be adjudicated in

the Arbitration rather than continuing to hold the claims in abeyance, as the Bankruptcy Court

previously had ordered.  Molner argued that the issue of payment of his legal expenses—the

same legal expenses he now seeks in the State Action—was "inextricably linked" to his proofs of

claim.[20]  Molner's motion was also based on many of the same allegations that he now raises in

the State Action, including that: (1) it supposedly was unfair that the Distribution Trust's

"professionals enjoy the privilege of administrative payment priority in these Cases"; and (2)

Reed Smith had "supported" the Molner Litigation Campaign and "rendered ongoing legal

advice costing very significant amounts."[21]

16.     The Bankruptcy Court denied Molner's motion at a February 28, 2018 hearing,

reasoning that centralizing in the Bankruptcy Court claims such as Molner's is "an important part

of what bankruptcy courts do in handling bankruptcies large and small," and the parties already

had agreed that the claims would be held in abeyance.[22]  At the hearing, Molner attempted to

raise "a potential disqualification issue in this case" concerning Reed Smith because Reed Smith

---

[20]  Bk. Dkt. No. 932 at 4.
[21]  *Id*. at 8, 10-12.
[22]  *See* Bk. Dkt. No. 951 at 16:16-20:13.

supposedly "previously represented me,"[23] which is related to Molner's claim against Reed Smith in the State Action for breach of fiduciary duty (although Molner never explains how Reed Smith ever owed him a fiduciary duty).  Judge Lane responded, "*You want to file a motion file a motion*. . . .  *This case is a case from 2014, it has been litigated to death*, and so if people think they're entitled to additional information or some relief *file a motion*."[24]  Molner and his entities never filed a motion seeking to disqualify Reed Smith, alleging any misconduct by the JVLs or Reed Smith, or anything else.

17.    Later in 2018, Molner attempted to serve subpoenas on the Distribution Trustee and counsel to the Distribution Trust (Reed Smith) to compel their live testimony in Molner's divorce action.  Molner supposedly wanted the testimony to justify a reduction in his spousal support obligations based on his purported loss of income caused by the commencement of the Chapter 11 Cases and termination of the ARP Services Agreement.  On September 24, 2018, the Bankruptcy Court issued a protective order that prevented Molner from seeking live testimony from the Distribution Trustee but required the Distribution Trust to provide a sworn affidavit (the "*Trust Affidavit*") for Molner to use in his divorce action, which the Distribution Trust had initially proposed.  The Trust Affidavit relates to the State Action because it addresses many of the same issues that are the subject of the State Action, including the circumstances leading to the commencement of the Chapter 11 Cases and rejection of the ARP Services Agreement.

18.    In March 2020, the Distribution Trustees and Molner and his entities settled all of the claims that had been asserted in the Arbitration.  Pursuant to that settlement, the Bankruptcy Court entered an order on June 8, 2020 expunging the Molner Claim and the ACP Claim with prejudice and without any distribution (the "*Expungement Order*").  The ARP Claim remains

---

[23]  *Id*. at 10:22-11:2.
[24]  *Id*. (emphasis added).

pending in the Chapter 11 Cases.

19.     On June 11, 2020, only three days after the Bankruptcy Court entered the Expungement Order, Molner filed (but did not serve) the Summons.  The Summons alleges that ACP and ARP have assigned to Molner their unspecified claims against the defendants in the State Action.  The Summons further claims that the same people and firms approved by the Bankruptcy Court to serve as JVLs, Distribution Trustees, and counsel to the JVLs and the Distribution Trust had been perpetrating a fraudulent scheme against Molner since 2014 and that Molner knew all of that no later than one day after the Petition Date.  Despite his active involvement in the Chapter 11 Cases over the following six years, as well as the Bankruptcy Court's express invitation to "file a motion" in the Bankruptcy Court if Molner wished to raise the matters about which he now complains in the State Action, Molner and his entities never did so.  They never filed a motion or objection to, or otherwise opposed: (1) the Petitions; (2) the retention and compensation of the JVLs and Reed Smith; (3) the order approving the rejection of the ARP Services Agreement; (4) the Disclosure Statement; (5) the Plan; (6) the Confirmation Order; (7) the form of the Distribution Trust Agreement; (8) the appointment of the Distribution Trustees; (9) the Distribution Trust's retention of Reed Smith; or (10) the compensation subsequently paid to the Distribution Trustees and Reed Smith.

**B.      Summary Of Basis For Removal**

20.     Removal is appropriate because the claims in the State Action are "related to" and "aris[e] in" the Chapter 11 Cases.  28 U.S.C. §§ 1334(b), 1452(a).  Molner's attempt to characterize his allegations as based solely on "pre-petition conduct" (*i.e.*, prior to the Chapter 11 Cases) is misplaced.  The damages sought all relate to and arise from the Chapter 11 Cases, as the foregoing summary, as well as the discussion below, demonstrate.

21.     Molner alleges that, while managing Aramid through his entities (ACP and ARP)

before the Petition Date, he proposed that Aramid pursue a voluntary liquidation from which he expected to derive significant compensation, but instead the JVLs and Reed Smith improperly commenced the Chapter 11 Cases.  The JVLs and Reed Smith allegedly harmed Molner by:

(1)     commencing the Chapter 11 Cases and terminating (after notice to Molner) the Debtors' relationship with Molner (by rejecting, pursuant to an order of the Bankruptcy Court, the ARP Services Agreement) during the Chapter 11 Cases, which divested Molner of control over Aramid and deprived him of the compensation that he expected to earn from overseeing a voluntary liquidation;

(2)     receiving allegedly excessive compensation from the Debtors (after notice to Molner) during the Chapter 11 Cases, even though that compensation was paid pursuant to procedures established in Bankruptcy Court orders and various interim *and final* fee requests made to, and approved by, the Bankruptcy Court;

(3)     causing Molner "to have to pay millions in fees associated with the bankruptcy filing and related litigation," including the Adversary Proceeding and the Arbitration; and

(4)     receiving allegedly excessive compensation from the Distribution Trust, even though that compensation was paid (with annual notice to Molner) pursuant to the Distribution Trust Agreement that is part of the Plan and was approved by the Confirmation Order.

22.     The Bankruptcy Court has entered myriad final, non-appealable orders that squarely address the issues about which Molner now complains in the State Action.  Although Molner has been an active participant in the Chapter 11 Cases since their inception over six years ago, Molner and his entities *never* filed an objection to nor otherwise opposed:

(1)     the commencement of the Chapter 11 Cases;

(2)     rejection of the ARP Services Agreement, which was authorized by an order of

13

the Bankruptcy Court, the Plan, and the Confirmation Order;

(3)     any compensation paid by the Debtors to the JVLs or Reed Smith, which was disclosed in 21 monthly operating reports, 20 monthly fee statements, 5 interim fee applications, and a final fee application, filed and served in the Chapter 11 Cases, and which was paid pursuant to procedures established by, and orders of, the Bankruptcy Court;

(4)     approval of the Disclosure Statement, which disclosed that the Debtors had numerous claims against Molner and his entities based on their mismanagement of the Debtors;

(5)     confirmation of the Plan pursuant to the Confirmation Order, including the Bankruptcy Court's determination that the Debtors proposed the Plan in good faith and its approval of the appointment of the Distribution Trustees and counsel to the Distribution Trust; or

(6)     any compensation paid by the Distribution Trust to the Distribution Trustees or Reed Smith pursuant to the Distribution Trust Agreement and disclosed in annual reports filed (and served on Molner) in the Chapter 11 Cases since 2016.

23.     Additionally, the claims in the State Action are duplicative of the claims filed by Molner and his entities in the Chapter 11 Cases.  Like Molner's claims in the State Action: (1) the ARP Claim, which is pending in the Chapter 11 Cases, requests unpaid compensation under the ARP Services Agreement during the Chapter 11 Cases and legal expenses relating to the Chapter 11 Cases; and (2) the Molner Claim and the ACP Claim, which were both expunged by the Expungement Order, requested legal expenses related to and arising from the Chapter 11 Cases.  The Bankruptcy Court already has denied one attempt by Molner to litigate outside the Bankruptcy Court his supposed entitlement to payment of his legal expenses.  That Molner now seeks to recover the same legal expenses (relating to the Chapter 11 Cases) from the Debtors' professionals does not alter the conclusion that, as the Bankruptcy Court held, such claims

14

should be adjudicated in the Bankruptcy Court.

24.     Accordingly, as discussed further below, Molner's claims are related to and arise in the Chapter 11 Cases for at least the following five reasons:

(1)     The State Action requires interpretation and enforcement of the Plan (including the Distribution Trust Agreement), the Confirmation Order, and ***numerous*** other final orders of the Bankruptcy Court.[25]  This includes whether the claims in the State Action are barred or otherwise affected by:

(A)     the release, exculpation and injunction provisions in the Plan and Confirmation Order;

(B)     the order authorizing the Debtors to reject the ARP Services Agreement;

(C)     the orders approving the Debtors' retention and compensation of the JVLs and Reed Smith; and

(D)     the Confirmation Order, including the Bankruptcy Court's (i) determination that the Debtors proposed the Plan in good faith, (ii) approval of the Debtors' list of rejected contracts that included the ARP Services Agreement, and (iii) authorization of the Distribution Trust's compensation of the Distribution Trustees and Reed Smith pursuant to terms set forth in the Plan and Distribution Trust Agreement.  *See infra* Section III.B.

(2)     The State Action requires adjudication of whether it is an impermissible collateral attack on the Plan and numerous final orders of the Bankruptcy Court.[26]  This includes:

---

[25]  *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("[A] Bankruptcy Court plainly ha[s] jurisdiction to interpret and enforce its own prior orders."); *In re Petrie Retail, Inc.*, 304 F.3d 223, 229-31 (2d Cir. 2002) (same); *In re Tronox*, 603 B.R. 712, 719 (Bankr. S.D.N.Y. 2019) (holding that "'[a]rising in' jurisdiction . . . plainly covers matters that require the interpretation or enforcement of orders issued during a bankruptcy case").

[26]  *See In re Tronox*, 603 B.R. at 721 (holding that "claims that functionally challenge the outcomes of bankruptcy cases, and that question whether orders entered in bankruptcy cases were proper or were instead the result of misconduct, are textbook examples of disputes that implicate the integrity of the bankruptcy process" and are subject to the bankruptcy court's "arising in" jurisdiction).

(A)      the order approving the Debtors' rejection of the ARP Services Agreement;

(B)      the orders establishing compensation procedures and approving the compensation paid to the JVLs and Reed Smith; and

(C)      the Confirmation Order, including its (i) good faith determination, which the Bankruptcy Court could not have provided if the Chapter 11 Cases were unnecessary or if the Plan furthered a scheme to defraud Molner as he now alleges, (ii) approval of the list of rejected contracts, including the ARP Services Agreement, and (iii) authorization of the Distribution Trust's compensation of the Distribution Trustees and Reed Smith.  *See infra* Section III.C.

(3)      The State Action pertains to, and thus requires analysis of, events that occurred in the Chapter 11 Cases.[27]  These events include:

(A)      whether the State Action is barred by the doctrines of waiver and estoppel because:

(i)      Molner and his entities appeared and participated in the Chapter 11 Cases and repeatedly raised the same issues in the Bankruptcy Court that he now alleges in the State Action, including that Molner was blindsided by the commencement of the Chapter 11 Cases and the Debtors' motion to reject the ARP Services Agreement, and that Reed Smith had approved the Molner Litigation Campaign and owed a fiduciary duty to Molner at some point in time, but:

(ii)      Molner never filed a motion to dismiss the Chapter 11 Cases or an objection to confirmation of the Plan, including the good faith determination, despite now alleging in the State Action that he had concluded the day after the Petition Date that the Chapter 11 Cases were commenced in bad faith as part of a scheme to defraud him; and

---

[27]  *See Lothian Cassidy LLC v. Ransom*, 428 B.R. 555, 560 (E.D.N.Y. 2010) (holding that claims that involved events that occurred "in the actual administration in bankruptcy court," and were "intimately related to the administration of the bankruptcy," "more than relate to the LOI bankruptcy proceeding—they 'arise in' it" (internal quotations omitted)).

(iii)     Molner never filed an objection to or otherwise opposed any of the matters about which he now complains, all of which occurred pursuant to final orders of the Bankruptcy Court, including (a) the Debtors' rejection of the ARP Services Agreement, (b) the compensation paid to the JVLs and Reed Smith in the Chapter 11 Cases, and (c) the compensation paid by the Distribution Trust to the Distribution Trustees and Reed Smith; and

(B)     events that occurred in the Bankruptcy Court regarding the Trust Affidavit that the Bankruptcy Court ordered the Distribution Trust to provide to Molner, which addresses many of the issues in the State Action, including the circumstances leading to the commencement of the Chapter 11 Cases and rejection of the ARP Services Agreement.  *See infra* Section III.D.

(4)     The State Action, which seeks legal expenses incurred by Molner and his entities in the Chapter 11 Cases and the Arbitration, and compensation allegedly owed to ARP during the Chapter 11 Cases: (A) is duplicative of the proofs of claim filed by Molner, ACP and ARP; and (B) requires adjudication of whether Molner's claims are barred or otherwise affected (*e.g.*, by doctrines including collateral attack, waiver and estoppel) by (i) the filing of the proofs of claim, (ii) the Bankruptcy Court's denial of Molner's motion to litigate the issue of his entitlement to payment of his legal fees outside the Bankruptcy Court, (iii) the Expungement Order, whereby the Bankruptcy Court approved the expungement with prejudice of the Molner Claim and the ACP Claim, and (iv) the ARP Claim, which remains a disputed claim in the Chapter 11 Cases. *See infra* Section III.E.[28]

(5)     The State Action has a "close nexus" to the Chapter 11 Cases for various reasons:

(A)     as noted above, the State Action (i) is duplicative of the proofs of claim filed by

---

[28]  *See In re Petrie Retail*, 304 F.3d at 230 (holding bankruptcy court had "arising in" jurisdiction over a dispute between non-debtors in part because the dispute constituted a "continued attempt" to recover compensation that was "originally claimed from the estate" in a proof of claim filed in a bankruptcy case).

Molner and his entities, (ii) requires the interpretation or enforcement of various Bankruptcy Court orders, and (iii) pertains to, and thus requires analysis of, events that occurred in the Chapter 11 Cases;

(B)     the State Action pertains to the same or substantially similar issues as the Adversary Proceeding, including a determination of the rights and/or liabilities of Molner and his entities arising from Molner's previous management of Aramid;

(C)     the State Action implicates the release and exculpation provisions of the Plan and the Confirmation Order; and

(D)     the State Action implicates indemnification rights of the Distribution Trustees and Reed Smith under the Distribution Trust Agreement, thus requiring interpretation, clarification and/or enforcement of the Distribution Trust Agreement, Plan, and Confirmation Order.

25.     In addition, the Plan and Confirmation Order provide that *the Bankruptcy Court has "retain[ed] exclusive jurisdiction"* with respect to all matters arising from or related to the Chapter 11 Cases, the Plan, and the implementation of this Confirmation Order," including jurisdiction to address the issues presented by the State Action.[29]  *See infra* Section III.F.

## II.     ADDITIONAL RELEVANT BACKGROUND

**A.     Events Leading Up To The State Action**

**1.     Prior To The Chapter 11 Cases, Molner Managed Aramid Through ACP And ARP**

26.     As noted above, Molner controlled ACP and ARP.[30]  Before the Petition Date, from August 2006 through May 2014, ACP managed the affairs of Aramid pursuant to the ACP

---

[29]  *See* Bk. Dkt. No. 710 at 43 (emphasis added), 97-98, 130-31; *see also In re Kassover*, 336 B.R. 74, 79 (Bankr. S.D.N.Y. 2006) (federal bankruptcy jurisdiction continues beyond the effective date of a chapter 11 plan when a matter or dispute has a "close nexus to the bankruptcy plan or proceeding" and the plan provides for the retention of jurisdiction).

[30]  *See* Summons at 4.

Services Agreement.  During this time, it is estimated that ACP (and by extension, Molner) reaped approximately $40 million in fees.  ACP owned 100% of Aramid's voting securities until they were cancelled pursuant to the Plan.[31]

27.     While managing the Debtors' affairs, Molner commenced the Molner Litigation Campaign against several targets, including in particular one of Aramid's borrowers, David Bergstein.[32]  The litigation was funded exclusively by millions of dollars from Aramid, resulted in no meaningful recoveries to Aramid, and contributed substantially to its liquidity problems.[33]

28.     Just over one month before the Petition Date, on May 1, 2014: (1) Molner caused the Debtors to terminate the ACP Services Agreement by mutual agreement, though certain provisions relating to indemnification and the reimbursement of expenses remained in effect; and (2) Molner caused the Debtors to retain ARP, pursuant to the ARP Services Agreement, to perform certain services for Aramid, including monetizing Aramid's remaining assets and assisting in Aramid's day-to-day management.  Under the ARP Services Agreement, ARP (and by extension, Molner) was eligible for fees from the Debtors for these services.

### 2.     The Debtors Commence The Chapter 11 Cases

29.     Upon commencing the Chapter 11 Cases on June 13, 2014, the Debtors identified the Molner Litigation Campaign as one of the principal reasons for the bankruptcy.[34]  The Debtors thereafter alleged in the Chapter 11 Cases that Molner and his entities had mismanaged Aramid by, among other things: (1) extracting "unearned and unbargained-for compensation" of "not less than *$40 million* in fees over an eight year period of steady decline for [Aramid]"; (2) "causing [Aramid] to enter into less than imprudent investment opportunities . . . [and]

---

[31] *Id.*; *see also* Bk. Dkt. No. 2 at 9; Bk. Dkt. No. 710 at 70.
[32] Bk. Dkt. No. 2 at 9-18.
[33] *Id.*
[34] *Id.*

manipulat[ing] the Fund's net asset value . . . by overvaluing the Fund's portfolio, thereby concealing the true worth of [Aramid's] asset base"; and (3) "caus[ing] [Aramid] to enter into no less than $110 million in insider transactions" with Molner's entities that "were not in the best interests of [Aramid]."[35]  Molner admits he knew about the filing one day after the Petition Date,[36] yet despite alleging in the State Action that the Chapter 11 Cases were "unnecessary" and part of a scheme to "defraud[]" Molner,[37] Molner and his entities never filed a motion to dismiss the Chapter 11 Cases or otherwise raised such concerns.

### 3.    The Bankruptcy Court Approves The Retention And Compensation Of The JVLs And Reed Smith

30.    On the Petition Date, the JVLs and Reed Smith each filed applications requesting authorization to be retained by the Debtors in the Chapter 11 Cases.[38]  On October 3, 2014, the Bankruptcy Court entered orders approving their retentions.[39]  Despite now alleging in the State Action that the JVLs and Reed Smith commenced the Chapter 11 Cases as part of a scheme to defraud Molner, Molner and his entities ***never*** filed an objection to the applications or the Debtors' retention of the JVLs or Reed Smith.

31.    The Bankruptcy Court's retention order required the JVLs to submit monthly invoices to the United States Trustee, and, absent objection, authorized the Debtors to pay all reasonable invoices from the JVLs, provided that the Debtors disclosed such payments by filing monthly operating reports in the Chapter 11 Cases.[40]  The order also provided that "[t]he Debtors shall provide status reports to . . . any party in interest that may request such reports."[41]  The

---

[35]  Adv. Dkt. No. 1 at 4-5 (emphasis in original); *see also* Bk. Dkt. No. 521 at 15; Bk. Dkt. No. 522; Bk. Dkt. No. 523 at 11-13.
[36]  Bk. Dkt. No. 13; Summons at 6.
[37]  Summons at 3, 6-7.
[38]  Bk. Dkt. Nos. 5-6.
[39]  Bk. Dkt. Nos. 135-36.
[40]  Bk. Dkt. No. 136 at 2.
[41]  *Id.*

Debtors filed 21 monthly operating reports covering the period from June 2014 through February 2016 that disclosed all amounts paid by the Debtors (specifically, Aramid) to the JVLs.[42]  Molner and his entities never filed any objection regarding the compensation paid to the JVLs despite disclosure of all of the reports to Molner and his entities.

32.     Pursuant to the order of the Bankruptcy Court approving Reed Smith's retention, as well as various requirements in the Bankruptcy Code and the Bankruptcy Rules governing the compensation of a debtor's bankruptcy counsel, Reed Smith filed: (1) "monthly fee statements" detailing the fees and expenses incurred each month; (2) "interim fee applications" requesting the Bankruptcy Court's interim approval of the fees and expenses incurred during each three-month period; and (3) a "final fee application" requesting the Bankruptcy Court's final approval of all fees and expenses incurred on behalf of the Debtors.  Between October 2014 and May 2016, Reed Smith publicly filed 20 monthly fee statements,[43] five interim fee applications,[44] an application for compensation regarding a contingency fee matter on behalf of the Debtors,[45] and a final fee application.[46]  Notices regarding Reed Smith's requests for the Bankruptcy Court's approval of its compensation, including its final fee application, were served on Molner.[47]

33.     The Bankruptcy Court entered orders approving each interim fee application and the contingency fee payment, and, on July 6, 2016, granted the ***final*** fee application, thereby approving all compensation paid by the Debtors to Reed Smith during the Chapter 11 Cases.[48]  Molner and his entities never filed any objection nor otherwise opposed any of the monthly fee

---

[42]  Bk. Dkt. Nos. 73-74, 101, 158, 195, 230, 259, 278, 294, 335, 356, 377, 408, 438, 471, 498, 552, 616, 649, 714, 740.
[43]  Bk. Dkt. Nos. 153, 154, 155, 198, 233, 264, 275, 301, 342, 363, 383, 419, 441, 476, 496, 555, 612, 652, 712, 738.
[44]  Bk. Dkt. Nos. 165, 322, 447, 658, 786.
[45]  Dk. Dkt. Nos. 429, 459.
[46]  Bk. Dkt. No. 786.
[47]  Bk. Dkt. Nos. 166, 168, 429, 431, 489, 491, 787-89.
[48]  Bk. Dkt. Nos. 205, 367, 468, 501, 758, 822.

statements or fee applications filed by Reed Smith.

### 4. The Bankruptcy Court Approves The Debtors' Rejection Of The ARP Services Agreement

34.     On October 1, 2014, the Debtors filed a motion in the Bankruptcy Court seeking to reject the ARP Services Agreement, thereby severing their relationship with Molner. The Debtors "determin[ed], in their business judgment, that the continued provision of services by ARP under the Services Agreement is no longer necessary during the pendency of these bankruptcy cases and that rejection of the Services Agreement is in the best interests of the estate."[49] Notice regarding the objection deadline and hearing was served on Molner on behalf of ARP.[50] Despite now claiming in the State Action that he was wrongfully "fired" and deprived of compensation he otherwise would have received under the ARP Services Agreement, neither Molner, ARP, nor any other party opposed or otherwise objected to the motion.

35.     On December 18, 2014, the Bankruptcy Court entered an order approving the Debtors' rejection of the ARP Services Agreement *nunc pro tunc* to the date of the motion (October 1, 2014).[51]

### 5. The Debtors Object To The Proofs Of Claim By Molner And His Entities And Commence The Adversary Proceeding Against Molner And ACP

36.     In December 2014, Molner, ACP and ARP each filed a proof of claim in the Chapter 11 Cases. The ARP Claim for $2,016,250 included over $1 million in unpaid fees and expenses pursuant to the ARP Services Agreement for the period following the Petition Date, and "an amount not less than $1,000,000" for indemnification with respect to any legal expenses that were owed or may become owed to ARP "relating to [its] involvement with . . . these

---

[49]  Bk. Dkt. No. 127 at 6.
[50]  Bk. Dkt. Nos. 127-28.
[51]  Bk. Dkt. No. 217.

Chapter 11 Cases" or the Molner Litigation Campaign.[52]  The Molner Claim, in an amount not less than $1,000,000, and the ACP Claim, in an amount not less than $2,365,950.50, both requested reimbursement and/or indemnification of legal expenses that were owed or may become owed to Molner and ACP, respectively, "relating to [Molner's and ACP's respective] involvement with . . . these Chapter 11 Cases" or the Molner Litigation Campaign.[53]

37.     On October 30, 2015, the Debtors filed objections to the claims of Molner, ACP and ARP on various grounds, including that: (1) Molner's "'scorched earth' litigation against many parties" and "taking of excessive fees was the result of his wielding control over the Debtor for his own personal advantage and to the great detriment of the stockholders and creditors"; (2) the amount requested by ARP was "wholly unreasonable" given its retention "a mere 43 days prior to the Petition Date"; and (3) the ARP Services Agreement was expressly contingent upon ratification by the JVLs, which never occurred.[54]

38.     On January 19, 2016, Molner and his entities responded to the objections in a reply brief and declaration by Molner that included several allegations identical to allegations Molner now raises in the State Action, including that Reed Smith supposedly: (1) had conducted a "months-long investigation (costing millions of dollars)" into claims that had been brought against Molner by Wimbledon Financing Master Fund, Ltd. ("***Wimbledon***") "and concluded that the allegations were meritless"; (2) "lauded Molner for his success" with respect to the Molner Litigation Campaign; and (3) "exchanged numerous communications with Molner which may be construed as Reed Smith providing legal advice to Molner [or his related entities]."[55]  The claims of Molner and ACP were subsequently held in abeyance pending the outcome of the Arbitration,

---

[52]  Bk. Dkt. Claim No. 42.
[53]  Bk. Dkt. Claim Nos. 41, 44.
[54]  Bk. Dkt. No. 521 at 15; Bk. Dkt. No. 522; Bk. Dkt. No. 523 at 11-13.
[55]  Bk. Dkt. No. 644 at 20-21; Bk. Dkt. No. 645 at 7-9; *see* Summons at 4, 7.

and the ARP Claim remains a disputed claim in the Chapter 11 Cases.

39.     In November 2015, the Debtors filed a motion requesting the Bankruptcy Court's approval of the Disclosure Statement with respect to the Plan.[56]  The Disclosure Statement stated that "the Debtors hold (or may hold) claims and causes of action against . . . Molner . . . ACP [and] ARP . . . relating to their involvement in or relating to the Molner Litigation and . . . the mismanagement of the Debtors' business, the taking of exorbitant fees (particularly in transactions that were of little or no benefit to the Debtors), and the commencement and conduct of the Molner Litigation and other claims and causes of action."[57]  Notice of the Debtors' motion to approve the Disclosure Statement had been served on Molner individually and on behalf of ARP, neither of whom ever filed an objection to the Disclosure Statement or raised any concern that the Chapter 11 Cases were filed as part of a fraudulent scheme.[58]  On December 18, 2015, the Bankruptcy Court entered an order approving the Disclosure Statement.[59]

40.     On February 9, 2016, Aramid commenced the Adversary Proceeding in the Bankruptcy Court against Molner, ACP and certain other entities affiliated with Molner, seeking to recoup over $150.5 million in losses that Aramid incurred as a result of misconduct by Molner and his entities.[60]  In May 2016, the Bankruptcy Court approved an agreement between the parties to the Adversary Proceeding to submit the dispute to Arbitration and to hold in abeyance the claims of Molner and ACP "pending final resolution of the [A]rbitration."[61]

---

[56]  Bk. Dkt. No. 538.
[57]  Bk. Dkt. No. 536 at 68.
[58]  Bk. Dkt. No. 541.
[59]  Bk. Dkt. No. 608.
[60]  *See Aramid Entertainment Fund Limited v. David Molner,* et al., Case No. 16-01025 (Bankr. S.D.N.Y. Feb. 9, 2016).  ARP was not named as a defendant in the Adversary Proceeding; ARP began providing services to the Debtors just over one month before the Petition Date.
[61]  Adv. Dkt. No. 16.

###### 6.        The Bankruptcy Court Confirms The Plan

41.    On February 19, 2016, the Bankruptcy Court entered the Confirmation Order, thus confirming the Plan and approving the Distribution Trust Agreement, including:

(1)      The Confirmation Order includes the Bankruptcy Court's determination that "[t]he Debtors have proposed the Plan in good faith," which is a prerequisite to confirmation of a plan pursuant to section 1129(a)(3) of the Bankruptcy Code.[62]

(2)      The Plan contains customary release and exculpation provisions protecting the Debtors' professionals, including the JVLs and Reed Smith, whereby the Debtors released all claims against the professionals, and the professionals were protected from liability to any party regarding various events that occurred in the Chapter 11 Cases, except in limited circumstances.[63]  In the Confirmation Order, the Bankruptcy Court expressly approved the release and exculpation provisions in the Plan, held that such provisions shall become effective as of the Effective Date, and enjoined all individuals and entities from commencing or prosecuting any claims released pursuant to the Plan.[64]

(3)      The Confirmation Order approved an exhibit to the Plan identifying contracts rejected by the Debtors, including the ARP Services Agreement.[65]

(4)      The Confirmation Order approved (a) the appointment of Geoffrey Varga and Jess Shakespeare (who previously served as the JVLs during the Chapter 11 Cases) as Distribution Trustees, (b) compensation of the Distribution Trustees from the Distribution Trust pursuant to the terms of the Distribution Trust Agreement, and (c) the Distribution Trustees'

---

[62]  Bk. Dkt. No. 710 at 4, 17.
[63]  *Id*. at 84-85.
[64]  *Id*. at 32.
[65]  *Id*. at 22, 141-42.

retention and compensation of legal counsel to assist them in carrying out their duties.[66]  The
Distribution Trustees retained Reed Smith as counsel to the Distribution Trust.

(5)     The Distribution Trust Agreement provides for the indemnification of the
Distribution Trustees and legal counsel to the Distribution Trust (*i.e.*, Reed Smith), including
legal expenses to defend against litigation "on account of any action or omission or breach of
contract by the Distribution Trustee in its capacity as such including actions or omissions with
respect to the Disputed Claims or Disputed Interests or otherwise arising out of or relating to
their performance under this Distribution Trust Agreement," except where such action or
omission constitutes bad faith, fraud, willful or intentional misconduct, or gross negligence.[67]

42.     Notice regarding the objection deadline and a hearing was served on Molner on
behalf of ARP.[68]  Despite now claiming in the State Action that the same professionals retained
as Distribution Trustees and counsel to the Distribution Trust commenced the Chapter 11 Cases
as part of a scheme to defraud Molner, Molner and his entities never filed an objection to
confirmation of the Plan nor otherwise opposed any of the matters above.

43.     The Plan's Effective Date is February 25, 2016.[69]  On the Effective Date, the
Distribution Trust resumed prosecution of the Adversary Proceeding (and subsequently, the
Arbitration) in place of Aramid.[70]  Liquidation of the Distribution Trust assets is currently
underway under the supervision of the Bankruptcy Court, and the Chapter 11 Cases remain
"open"—they have not been closed pursuant to section 350 of the Bankruptcy Code.

---

[66]  *Id*. at 11-12, 79, 109, 116-20.
[67]  *Id*. at 124-25.
[68]  Bk. Dkt. Nos. 620-21.
[69]  Bk. Dkt. No. 718.
[70]  Bk. Dkt. No. 710 at 34.

7.      **The Distribution Trustees Have Disclosed All Compensation Paid By The Distribution Trust To The Distribution Trustees And Reed Smith Since 2016**

44.      The Distribution Trustees filed in the Chapter 11 Cases annual reports from 2016 to 2019 disclosing, among other things, the fees and expenses paid by the Distribution Trust to the Distribution Trustees and Reed Smith.[71]  The annual reports were served on Molner.[72] Molner and his entities never filed any objection to, or otherwise opposed, any such payments.

8.      **The Bankruptcy Court Denies Molner's Request To Litigate In The Arbitration The Issue Of Whether He And His Entities Were Entitled To Payment Of Their Legal Expenses, Holding That Their Claims For Legal Expenses (Which Molner Now Seeks In The State Action) Must Be Adjudicated In The Bankruptcy Court**

45.      As noted, the Bankruptcy Court ordered in May 2016 that the claims of Molner and his entities for legal expenses incurred during the Chapter 11 Cases should be "held in abeyance" pending the Arbitration.  *See supra* Section II.A.5.  On January 6, 2018, Molner asked the Bankruptcy Court to permit that issue to be adjudicated in the Arbitration.[73]  Molner's motion was based on many of the same allegations that he now raises in the State Action.  Those allegations included: (1) it was unfair for the Distribution Trust to deny payments to Molner "while its professionals enjoy the privilege of administrative payment priority in these Cases"; (2) a "majority" of the legal expenses requested by Molner and his entities relate to litigation brought against Molner by Wimbledon, as to which Reed Smith conducted an investigation and supposedly "cleared" Molner and his entities of any wrongdoing; and (3) Reed Smith "supported" the Molner Litigation Campaign and "rendered ongoing legal advice costing very

---

[71]  Bk. Dkt. Nos. 877, 947, 985, 1014.

[72]  Bk. Dkt. Nos. 878, 986, 1015.

[73]  Bk. Dkt. No. 932 at 7 ("I am respectfully asking this Court to clarify its prior order and/or provide relief from that order's stay, such that the UK tribunal be vested with the binding authority to broadly determine the nature and extent of [the Distribution Trust's] liability under the indemnity, including as it relates to (i) the cost of the arbitral proceedings and (ii) the claims lodged by me (or my related companies) in these Cases.").

significant amounts."[74]  ***Molner*** and his entities also argued that payment of his legal expenses "is ***inextricably linked*** to both the underlying causes of action in the [Arbitration] and a majority of the Claims [filed by Molner and his entities in the Chapter 11 Cases]."[75]

46.     The Distribution Trust objected to Molner's motion, arguing that Molner was seeking to "eliminate this Court's role in the adjudication of the Claim Objections . . . by having the [Arbitration] deal with the indemnification requested in the Proofs of Claims."[76]  On February 28, 2018, the Bankruptcy Court denied Molner's motion, holding that centralizing in the Bankruptcy Court claims such as Molner's is "an important part of what bankruptcy courts do in handling bankruptcies large and small," and the parties had agreed upon a "dividing line" whereby Molner's claims for legal expenses would be adjudicated by the Bankruptcy Court after the Arbitration had concluded.[77]  In the State Action, Molner now seeks from the Debtors' professionals the same legal expenses that, as Molner put it, are "inextricably linked" to the Arbitration and his proofs of claim in the Chapter 11 Cases.[78]

47.     At the hearing on his motion, Molner also raised his "concern that there is a potential disqualification issue in this case" regarding Reed Smith because Reed Smith "previously represented me," which Reed Smith denied.[79]  Judge Lane responded to Molner:

> All right.  ***You want to file a motion file a motion***.  I'm not here to have an open discussion about issues.  ***This case is a case from 2014, it has been litigated to death***, and so if people think they're entitled to additional information or some

---

[74]  *Id*. at 8, 10-12; *see* Summons at 3, 4.
[75]  Bk. Dkt. No. 932 at 4 (emphasis added).
[76]  Bk. Dkt. No. 942 at 9-16.
[77]  *See* Bk. Dkt. No. 951 at 16:16-20:13 ("[I]ndemnification claims . . . [are] a claim like any other claim. . . . [T]hat's really a part of what a debtor in filing a case bargains for is to say we want to basically centralize all the disputes, all the claims, all of the people who say that we owe them some money and we want to centralize it in the form of the bankruptcy court to the fullest extent under applicable law.  So I really would be undercutting the benefit of the bargain that a debtor makes in filing here by sending those claims elsewhere.").
[78]  Bk. Dkt. No. 932 at 4.
[79]  Bk. Dkt. No. 951 at 6:16-8:6, 10:17-21, 11:21-23.

28

relief *file a motion*.  I can't respond to those kind of general questions.[80]

48.     Although the Summons is pled in entirely conclusory fashion, Molner now raises the same allegation in the State Action by suing Reed Smith for breach of fiduciary duty.  Yet Molner and his entities never filed a motion in the Bankruptcy Court seeking to disqualify Reed Smith or alleging any misconduct by the JVLs or Reed Smith.

> **9.     The Bankruptcy Court Enters A Protective Order Preventing Molner From Serving A Subpoena On A Distribution Trustee Regarding The Same Issues That Molner Now Seeks To Raise In The State Action**

49.     In June and September 2018, Molner attempted to serve a subpoena on Geoffrey Varga, a JVL and later Distribution Trustee, demanding his testimony in Molner's divorce action.[81]  Molner wanted Varga to testify about an email from Varga to Molner on March 3, 2015 (the "*March 2015 Email*") that pertained to the Chapter 11 Cases.[82]  Molner sought that testimony as part of his effort to reduce his spousal support obligations.[83]

50.     The Distribution Trust sought a protective order in the Bankruptcy Court, arguing that: (1) Molner had an "ulterior motive" to use Varga's testimony in the Arbitration; (2) the subpoenas "invade the 'rights, powers and privileges' afforded to the Distribution Trustee under the Trust Agreement to appropriately, and without undue influence or interruption, 'manage the affairs of [the Distribution Trust] and safeguard the interest of the Beneficiaries"; and (3) the Confirmation Order provided that the Bankruptcy Court had retained "exclusive jurisdiction" over all such matters arising from or related to the Plan and the Distribution Trust Agreement.[84]

51.     At a September 24, 2018 hearing, Molner confirmed that Varga's testimony would pertain to the March 2015 Email "and circumstances surrounding th[e] decision" to

---

[80]   *Id*. at 10:22-11:2 (emphasis added).
[81]   Bk. Dkt. No. 965 ¶¶ 21-22.
[82]   *Id*. ¶¶ 18-20; Bk. Dkt. No. 966 ¶ 5; Bk. Dkt. No. 966-4.
[83]   Bk. Dkt. No. 968 at 14:20-17:12.
[84]   Bk. Dkt. No. 965 at 13-16 (quoting the Distribution Trust Agreement, Bk. Dkt. No. 710 at 116).

commence the Chapter 11 Cases."[85]   Judge Lane observed:

> THE COURT:  Well why in God's name would it make any difference why -- the facts and circumstances surround [sic] the decision to file bankruptcy?

> MR. MOLNER:  Because that was specifically not contemplated and we've had testimony from prior directors at Aramid.  **The plan was never to file a bankruptcy in New York because the company was not insolvent**.[86]

52.    Molner never suggested that the Chapter 11 Cases were commenced as part of a fraudulent scheme.  Judge Lane ordered the Distribution Trust to "provide a written declaration in a form that would be admissible in New York State Court" addressing the issues in the March 2015 Email, which the Distribution Trust had initially proposed, and "order[ed] on a temporary basis that no other discovery be sought from Mr. Varga."[87]   The Distribution Trust provided to Molner the Trust Affidavit reciting the statements in the March 2015 Email.[88]

53.    One month later, on October 24, 2018, Molner filed a motion to dissolve the protective order to serve subpoenas on Varga **and** James McCarroll, a Reed Smith attorney and defendant in the State Action.[89]   Molner's outline of proposed topics of the testimony included: (1) "what the events were leading up to the filing of the chapter 11"; (2) the circumstances surrounding Varga's engagement as a JVL and the terms of his engagement; (3) "[p]ayments to Asset Resolution Partners ('ARP') before and after the chapter 11 was filed"; and (4) "[t]he motion to terminate ARP's contract."[90]

54.    At the October 30, 2018 hearing, Judge Lane admonished Molner that "you're

---

[85]   Bk. Dkt, No. 968 at 16:3-22 ("Mr. Varga . . . sent me an email saying no, you're right about these facts and circumstances that led to my decision to file the bankruptcy because it was a complete surprise to me and ran counter to all of our other discussions, and indeed, our written contract.").

[86]   *Id*. at 16:3-12, 17:15-18:1 (emphasis added).

[87]   *Id*. at 23:9-25:20.

[88]   Bk. Dkt. No. 974 ¶ 3; Bk. Dkt. No. 974-2.

[89]   Bk. Dkt. No. 972.

[90]   Bk. Dkt. No. 973 ¶ 13; Bk. Dkt. No. 974 ¶ 6; Bk. Dkt. No. 974-4.

starting now to depose lawyers and . . . this has become a huge, huge mess."[91]  Molner's motion

was subsequently rendered moot when Reed Smith successfully quashed the subpoena in the

divorce action and the Special Referee denied Molner's request for live testimony from Varga.[92]

### 10.   The Bankruptcy Court's Expungement Order

55.     The Arbitration between the Distribution Trustees, on the one hand, and Molner,

ACP and certain of Molner's entities, on the other hand, ultimately was settled.  On June 8, 2020,

the Bankruptcy Court entered the Expungement Order, which: (1) referenced and relied on the

"Settlement Agreement and Release, dated as of March 24, 2020, that provides for the

disallowance with prejudice" of the Molner Claim and the ACP Claim; and (2) provided that the

Molner Claim and ACP Claim "are DISALLOWED WITH PREJUDICE" and that the

Distribution Trust "shall not make any distribution on account of" those claims.[93]  The ARP

Claim was not expunged and remains a disputed claim in the Chapter 11 Cases.  The Adversary

Proceeding also remains pending in the Bankruptcy Court.

### B.   Summary Of The State Action

56.     On June 11, 2020, Molner commenced the State Action by filing (but not serving)

the Summons, which vaguely describes Molner's purported causes of action.  No complaint has

yet been filed, but the Summons states that Molner will sue the professionals who represented

the Debtors and currently represent the Distribution Trust in the Chapter 11 Cases, including the

JVLs, the Distribution Trustees, and Reed Smith.  Molner purported to serve the Summons on

Reed Smith on October 6, 2020.  As of the date hereof, the Summons is the only pleading that

has been served on Reed Smith.

---

[91]   Bk. Dkt. No. 991 at 10:19-25.
[92]   Bk. Dkt. Nos. 976-78.
[93]   Bk Dkt. No. 1020.

57.    Molner essentially admits in the Summons that he is barred from pursuing any claims regarding events that occurred in the Chapter 11 Cases.  Instead, Molner tries to argue that his claims arise "specifically and exclusively in regard to [the defendants'] pre-petition conduct."[94]  But the Summons itself reveals that Molner's claims and alleged damages actually arise from, and relate to, the commencement of the Chapter 11 Cases and myriad events therein. Molner alleges:

(1)    Five months before the Petition Date, in January 2014, Molner proposed to Aramid's directors that Aramid pursue a voluntary liquidation of its portfolio of assets;

(2)    Molner expected significant compensation to oversee that voluntary liquidation;

(3)    the JVLs and Reed Smith instead "*filed a Chapter 11 Petition*" for Aramid, without Molner's consent;

(4)    "*[i]n the weeks and months that followed [the Petition Date]*, the defendants worked together against Molner ensuring that he would lose the income, business opportunities, and other compensation he was entitled to, and instead have to pay millions in fees *associated with the bankruptcy filing and related litigation*";

(5)    the JVLs and Reed Smith "fired and sued" Molner during the Chapter 11 Cases by rejecting the ARP Services Agreement and commencing the Adversary Proceeding against him and ACP; and

(6)    the JVLs and Reed Smith "set about looting [Aramid's] assets *through their control of the bankruptcy process and the hefty fees they charged*."[95]

58.    Molner plainly is alleging liability for: (1) compensation that Molner (through ACP and ARP) expected to receive from the Debtors subsequent to the Petition Date; (2)

---

[94]    Summons at 7.
[95]    *Id*. at 3-7 (emphasis added).

compensation paid by the Debtors to the JVLs and Reed Smith during the Chapter 11 Cases; (3) compensation paid by the Distribution Trust to the Distribution Trustees and Reed Smith related to the Chapter 11 Cases; and (4) all legal expenses incurred by Molner, ACP and ARP relating to the Chapter 11 Cases, the Adversary Proceeding, and the Arbitration.

59.     Based on the foregoing, the Summons enumerates various causes of action against the professionals, including fraud, fraudulent concealment, constructive fraud, breach of confidence, unjust enrichment, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty.[96]   The Summons also references purported claims against Reed Smith for breach of fiduciary duty and breach of a joint defense agreement between Reed Smith and Molner in connection with the Wimbledon litigation in 2010, though it does not explain how Reed Smith ever owed a fiduciary duty to Molner or "misused" any information obtained pursuant to the joint defense agreement.[97]   The Summons alleges that ACP and ARP have assigned their unspecified claims to Molner.[98]

### III.     GROUNDS FOR REMOVAL

#### A.     Legal Standard

60.     "A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."   28 U.S.C. § 1452(a).   Section 1334, in turn, provides that this Court has original jurisdiction over "all civil proceedings arising under title 11, or ***arising in*** or

---

[96]   *Id.* at 7.
[97]   *Id.* at 4, 6-7.
[98]   *Id.* at 7.

*related to* cases under title 11." 28 U.S.C. § 1334(b) (emphasis added).

61.     Because section 1334(b) is phrased in the disjunctive (*i.e.*, "arising in *or* related to cases under title 11"), if a matter arises in a bankruptcy case, then it is not necessary to determine whether it also relates to the bankruptcy, and vice versa.[99]  However, in this instance, the State Action arises in *and* is related to the Chapter 11 Cases.

62.     "Related to" jurisdiction extends to "litigation [that] has a significant connection with a pending bankruptcy proceeding [such that] its outcome might have any '*conceivable effect*' on the bankruptcy estate."  *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 114 (2d Cir. 1992) (emphasis added) (citation omitted).  "Certainty, or even likelihood, is not required" to have a "conceivable effect on a bankruptcy estate."  *Bayerische Landesbank v. Deutsche Bank AG (In re Residential Capital, LLC)*, 488 B.R. 565, 573 (Bankr. S.D.N.Y. 2013) (internal quotations omitted).  "Related to" jurisdiction does not require claims directly against the debtor or the debtor's property.  *In re Cuyahoga Equip.,* 980 F.2d at 114.

63.     "Arising in" jurisdiction covers situations in which claims "appear to be based in state law [but] are really an extension of the proceedings already before the bankruptcy court." *Baker v. Simpson*, 613 F.3d 346, 348-51 (2d Cir. 2010) (holding that "ostensibly" state law malpractice claims brought against the debtor's counsel "clearly" "arise in" the bankruptcy because the "gravamen in each claim" pertained to events that occurred "in the course of" the bankruptcy case and the claims were "inseparable from the bankruptcy context," thus "implicat[ing] the integrity of the entire bankruptcy process" (internal quotations omitted)).

---

[99]     *See In re Residential Capital, LLC*, 515 B.R. 52, 62 (Bankr. S.D.N.Y. 2014) (holding that because "the action [i]s one 'arising in' a bankruptcy case . . . the Court need not determine whether the claims are 'related to' the bankruptcy proceeding"); *In re Refco, Inc. Sec. Litig.*, 628 F. Supp. 2d at 445 (S.D.N.Y. 2008) (holding that the removing defendants "establish[ed] 'related to' jurisdiction in this case," and "[a]ccordingly, the Court need not address the Removing Defendants' alternative arguments for jurisdiction").

"Claims of . . . malfeasance against court-appointed professionals are frequently core, arising-in, claims within the scope of § 1334(b)" because "[s]uch claims are routinely uniquely affected by bankruptcy proceedings and directly affect a core bankruptcy function." *D.A. Elia Const. Corp. v. Damon Morey LLP*, 2013 WL 1337194, at *9 (W.D.N.Y. Mar. 29, 2013).

64.     The State Action is related to and arises in the Chapter 11 Cases for each of the five independent reasons discussed below.  Upon removal to this Court, the State Action respectfully should be referred to the Bankruptcy Court pursuant to the Standing Order.

**B.     The State Action Requires The Interpretation And Enforcement Of The Plan And Numerous Orders Of The Bankruptcy Court, Including Whether The State Action Is Barred By Release And Exculpation Provisions In The Plan**

65.     Litigation "relates to" and also "arises in" a bankruptcy case when the action requires the interpretation or enforcement of an order entered in a bankruptcy case.  *See Travelers,* 557 U.S. at 151 (a "Bankruptcy Court plainly ha[s] jurisdiction to interpret and enforce its own prior orders"); *In re Petrie Retail*, 304 F.3d at 229-31 (same); *In re Gen. Growth Props., Inc.*, 460 B.R. 592, 598 (Bankr. S.D.N.Y. 2011) (holding that the bankruptcy court had "related to" and "arising in" jurisdiction "[b]ecause interpretation, construction and enforcement of the Plan and confirmation order is implicated by the State Court Action" between non-debtors); *In re Tronox*, 603 B.R. at 719 (""[a]rising in' jurisdiction . . . plainly covers matters that require the interpretation or enforcement of orders issued during a bankruptcy case").[100]  So long as a lawsuit requires interpretation or enforcement of a bankruptcy court order, jurisdiction over the lawsuit exists regardless of the outcome or anticipated outcome of issues to be litigated.[101]

---

[100]    *See also In re Motors Liquidation Co.*, 522 B.R. 13, 20 (Bankr. S.D.N.Y. 2014) (same); *In re Sterling Optical Corp.*, 302 B.R. 792, 801 (Bankr. S.D.N.Y. 2003) (same); *Lothian Cassidy, LLC v. Lothian Exploration & Dev. II, L.P.*, 487 B.R. 158, 162 (S.D.N.Y. 2013) (same); *CCM Pathfinder Pompano Bay, LLC v. Compass Fin. Partners LLC*, 396 B.R. 602, 605-06 (S.D.N.Y. 2008) (denying motion to remand action to state court because the action "likely will involve interpretations of" the chapter 11 plan, confirmation order, and other bankruptcy court orders).

[101]    *See In re Motors Liquidation Co.*, 522 B.R. at 20-21 ("Nor is it an answer for the Sesay Plaintiffs to contend

66.     The State Action requires interpretation and enforcement of the Plan, the Confirmation Order, and many other orders by the Bankruptcy Court in the Chapter 11 Cases with respect to myriad issues:

(1)     The Plan contains a release of all claims by the Debtors against any "Released Party" as of the Effective Date, including claims that arose before the Petition Date (as Molner attempts to characterize his claims), except to the extent that a court of competent jurisdiction has entered a "Final Order" determining that an act or omission "resulted from fraud or willful misconduct." *See supra* Section II.A.6.[102]  The Plan expressly defines "Released Parties" to include the JVLs and Reed Smith.[103]  The State Action alleges a general harm caused by the commencement of the Chapter 11 Cases and the compensation paid by the Debtors to its professionals during the Chapter 11 Cases.  *See supra* Section II.B.  The claims in the State Action therefore are derivative of claims that belonged to the Debtors' estates and that were released under the Plan.[104]

(2)     To the extent that Molner seeks damages for allegedly excessive fees paid by the Distribution Trust after the Effective Date, federal adjudication is required to determine whether Molner is attempting to bring claims that belong exclusively to the Distribution Trust.

---

that because they believe their claims, in whole or in part, should not be found to be covered by my earlier order, or my earlier order should not have said what it did or was invalid, my subject matter jurisdiction to decide those issues evaporates. . . .  [E]ach contention assumes the fact to be decided. . . .  [T]he simple fact is that New GM seeks construction and enforcement of the Sale Order, and I have subject matter jurisdiction to do exactly that.").

[102]   Bk. Dkt. No. 710 at 84.

[103]   *Id*. at 62.

[104]   *See St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action."); *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 88-89 (2d Cir. 2014) ("A claim based on rights 'derivative' of, or 'derived' from, the debtor's typically involves property of the estate. . . .  We have defined so-called 'derivative claims' in the context of bankruptcy as ones that arise[ ] from harm done to the estate' and that 'seek [ ] relief against third parties that pushed the debtor into bankruptcy." (internal quotations omitted)).

(3)     All claims of the Debtors' "affiliates" were also released pursuant to the Plan, which defines that term as provided in the Bankruptcy Code.[105]  There, an "affiliate" is, among other things: (1) an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities . . . (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote"; and (2) an "entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement."  11 U.S.C. § 101(2).  Accordingly, federal adjudication is required to determine whether Molner, ACP and/or ARP were "affiliates" of the Debtors within the meaning of the Plan because, for example:

(A)     ACP owned 100% of Aramid's voting securities until such securities were cancelled pursuant to the Plan on the Effective Date;

(B)     by virtue of Molner's control over ACP, he directly or indirectly owned, controlled and/or held 20% or more of Aramid's voting securities; and

(C)     both ACP and ARP operated Aramid or substantially all of its property pursuant to the ACP Services Agreement and the ARP Services Agreement, respectively.  *See supra* Section II.A.1.

(4)     The exculpation provision in the Plan provides that the "Released Parties" (including the JVLs and Reed Smith) "shall neither have nor incur any liability to any [individual or entity] for any act taken or omitted . . . in connection with the Debtors' post-petition liquidation activity, including the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan . . . [and] the Distribution Trust Agreement," except to the

---

[105]  Bk. Dkt. No. 710 at 54.

extent that a court of competent jurisdiction has entered a "Final Order" determining that the act

or omission "resulted from fraud or willful misconduct."[106]  Molner alleges damages related to

and arising from events that occurred *in* the Chapter 11 Cases.  Consequently, the State Action

requires federal adjudication of whether Molner's claims implicate the exculpation provision

because Molner seeks to establish "liability . . . in connection with the Debtors' post-petition

liquidation activity."[107]

(5)     The release and exculpation provisions contain an exception for a court's "Final

Order" determining "fraud or willful misconduct."[108]  The State Action therefore requires federal

interpretation and adjudication of that exception in the Plan.

(6)     The State Action requires interpretation and enforcement of other orders of the

Bankruptcy Court that are implicated by the State Action, including:

(A)     the order authorizing the Debtors to reject the ARP Services Agreement;

(B)     the orders approving the Debtors' retention and compensation (on an interim and

*final* basis) of the JVLs and Reed Smith; and

(C)     the Confirmation Order, including its determination that the Debtors proposed the

Plan in good faith, its approval of the Debtors' list of rejected contracts (including the ARP

Services Agreement), and its authorization of the Distribution Trust's compensation of the

Distribution Trustees and Reed Smith.  *See supra* Sections II.A.3-4, II.A.6.

**C.     The State Action Requires Federal Adjudication Of Whether The Claims In The State Action Are Barred As A Collateral Attack On The Plan And Numerous Final Orders Of The Bankruptcy Court**

67.     A lawsuit relates to and arises in a bankruptcy case when it constitutes a collateral

---

[106]  Bk. Dkt. No. 710 at 85.
[107]  *Id.*
[108]  *Id.* at 84-85.

attack on an order of the Bankruptcy Court, including an order approving compensation of the

debtor's professionals. *In re Tronox*, 603 B.R. at 723 (holding that malpractice claims by tort

victims alleging their counsel committed errors and obtained an insufficient recovery in a

bankruptcy case was subject to the bankruptcy court's "arising in" jurisdiction, even though no

debtor was involved, because "perhaps most importantly, the asserted claims directly implicate

the integrity of the bankruptcy process"); *D.A. Elia Const. Corp.*, 2013 WL 1337194, at *9-10

(holding that district court had "arising in" jurisdiction over a dispute between a debtor and its

former counsel, including a fraud claim that allegedly "relate[d] to matters that occurred outside

the bankruptcy," because the action effectively challenged the fairness and propriety of the order

of the bankruptcy court approving counsel's final fee application).[109]

68.     The State Action requires adjudication of whether Molner's claims are barred as a

collateral attack on the Plan and numerous final, non-appealable orders of the Bankruptcy Court

that squarely address—and ***foreclose***—the matters about which Molner now complains.  These

include:

(1)     the commencement of the Chapter 11 Cases, which was allegedly "unnecessary"

and part of a scheme to defraud Molner, even though the Confirmation Order determined that the

Debtors proposed the Plan in "good faith," as is required pursuant to section 1129(a)(3) of the

Bankruptcy Code.  *See supra* Sections II.A.6, II.B; *In re Koelbl*, 751 F.2d at 139 (good faith

"require[es] a showing that the plan was proposed with honesty and good intentions," and "has

been found to be lacking if the plan was proposed for ulterior motives" (internal quotations

---

[109]   *See also In re AFY, Inc.*, 571 B.R. 825, 835 (B.A.P. 8th Cir. 2017) (holding bankruptcy court had "arising in" and "related to" jurisdiction over state law claims that constituted a "collateral attack on federal court orders entered in the AFY bankruptcy" because "the purported actions by the defendants occurred during and as part of the bankruptcy case and resulted in orders by the bankruptcy court"), *aff'd*, 902 F.3d 884, 834-35 (8th Cir. 2018); *White v. Kubotek Corp.*, 487 B.R. 1, 7 (D. Mass. 2012) (holding bankruptcy court had "arising in" jurisdiction because, "[a]lthough framed as state law claims, both of White's claims depend on an interpretation of the Bankruptcy Court's Sale Order and an attack on its legitimacy").

omitted)); *Telecom Argentina*, 528 F.3d at 174 (good faith is lacking if a debtor pursues "a debt restructuring it knew was unnecessary");

(2)      Molner's termination during the Chapter 11 Cases, which occurred pursuant to the Bankruptcy Court's order authorizing and approving the Debtors' rejection of the ARP Services Agreement and the Plan's designation of the ARP Services Agreement as a rejected contract. *See supra* Sections II.A.4, II.A.6; and

(3)      allegedly excessive compensation paid to the JVLs, the Distribution Trustees, and Reed Smith, where those payments were made pursuant to (a) orders establishing compensation procedures for each professional, (b) five separate orders approving Reed Smith's fee applications and the order approving Reed Smith's compensation in connection with a contingency fee matter, and (c) the Confirmation Order, including the approval of the Distribution Trust's compensation of the Distribution Trustees and Reed Smith according to the terms of the Distribution Trust Agreement.  *See supra* Sections II.A.3, II.A.6.

69.      Adjudication is also required to determine whether the claims in the State Action are barred as a collateral attack on the Plan[110] because:

(1)      Molner is attempting to circumvent the liquidation process approved by the Bankruptcy Court regarding the Plan and the Distribution Trust, to effectively obtain a higher "priority" (*i.e.*, right to payment) than creditors with claims that were "allowed" under the Plan, based on claims that allege general harm to all stakeholders during the Chapter 11 Cases; and

(2)      the State Action is contrary to the release and exculpation provisions of the Plan,

---

[110]    *See Back v. LTV Corp. (In re Chateaugay Corp.)*, 213 B.R. 633, 637 (S.D.N.Y. 1997) (affirming bankruptcy court's issuance of injunction with respect to litigation in state court and declaring that, "[n]otwithstanding appellants' contention to the contrary, their allegations go to the heart of the bankruptcy proceeding.  This Court therefore adopts the Bankruptcy Court's language that 'these allegations constitute a collateral attack on the Sale Order, the Plan and the Confirmation Order as well as on the entire bankruptcy process as it relates to Debtors' chapter 11 cases'"); *see generally Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869 (2d Cir. 1991) (noting that an order confirming a plan of reorganization has preclusive effect).

the Confirmation Order, and the Distribution Trust Agreement, and will deplete resources of the

Distribution Trust (*e.g.*, by implicating indemnification rights of the Distribution Trustees and

Reed Smith in the State Action).

**D.    The State Action Requires Analysis Of Events That Occurred In The Chapter 11 Cases, Including Federal Adjudication Of Whether The Claims In The State Action Are Barred By The Doctrines Of Waiver And Estoppel**

70.    Litigation between non-debtors under state law relates to and arises in a

bankruptcy case when the litigation pertains to events that occurred *in* the bankruptcy case,

including the compensation paid to the debtor's professionals.  *See Lothian*, 428 B.R. at 560

(holding district court had "arising in" jurisdiction over state law claims by investors against the

debtor's directors, officers and attorneys who initiated and participated in the debtor's

reorganization process because the claims alleged misconduct "in the actual administration in

bankruptcy court of [the debtor's] bankruptcy estate" and were "intimately related to the

administration of the bankruptcy" (internal quotations omitted)); *Winstar Holdings, LLC v.

Blackstone Grp. L.P.*, 2007 WL 4323003, at *1, *3-5 (S.D.N.Y. Dec. 10, 2007) (holding

bankruptcy court had "related to" and "arising in" jurisdiction over claims by non-debtors

against financial advisors who guided the debtors' reorganization process "with the approval of

the Bankruptcy Court," that "sound[ed] solely in New York common law" and alleged that "the

professionals advising the estate obtained *excessive* compensation by defrauding the purchaser of

the estate's assets," because the claims were "closely connected to the administration of the

bankruptcy" and the bankruptcy court "has a vital interest in policing the integrity of the

bankruptcy process in general" (emphasis in original)).

71.    As noted, Molner alleges he was harmed by various events that occurred in the

Chapter 11 Cases pursuant to orders of the Bankruptcy Court, including:

(1)    commencement of the Chapter 11 Cases as part of an alleged scheme to defraud

Molner, which is contrary to the Bankruptcy Court's determination in the Confirmation Order that the Debtors proposed the Plan in good faith;[111]

(2)    Molner's termination during the Chapter 11 Cases, which occurred pursuant to the order of the Bankruptcy Court authorizing the Debtors to reject the ARP Services Agreement and the Plan's identification of the ARP Services Agreement as a rejected contract; and

(3)    compensation paid to the JVLs, the Distribution Trustees, and Reed Smith pursuant to orders establishing compensation procedures and expressly approving such compensation. *See supra* Section II.B.

72.    Each of Molner, ACP and ARP was a "party in interest" with the right to raise and be heard on any issue in the Chapter 11 Cases based on their "stake in the outcome of the bankruptcy case," including their status as creditors and their equity interests in Aramid.[112] Despite his active participation in the Chapter 11 Cases and notice of all of the matters above, Molner and his entities never filed any objection to, nor otherwise opposed, any of them.

73.    In addition, Molner's claims are foreclosed by federal law, including the doctrines of waiver and estoppel, for several reasons:

(1)    Notice of the commencement of the Chapter 11 Cases was served on Molner, who admits knowing, one day after the Petition Date, about the Chapter 11 Cases and believing that the Chapter 11 Cases were "unnecessary" and part of a scheme to defraud him. *See supra*

---

[111]  "The ability collaterally to attack bankruptcy petitions in the state courts would also threaten the uniformity of federal bankruptcy law, a uniformity required by the Constitution." *In re Chateaugay Corp.*, 213 B.R. at 637 (quoting *Gonzales v. Parks*, 830 F.2d 1033, 1035 (9th Cir. 1987) (state courts lack jurisdiction to adjudicate claim that filing of bankruptcy petition constituted abuse of process)) (internal quotation marks omitted).

[112]  *See* 11 U.S.C. §§ 1109(b) ("A party in interest, including . . . a creditor, [or] an equity security holder . . . may raise and may appear and be heard on any issue in a case under this chapter.") and 102(3) ("'includes' and 'including' are not limiting); *In re FRG, Inc.*, 107 B.R. 461, 467 (Bankr. S.D.N.Y. 1989) ("It is established that section 1109(b)'s enumeration of entities having party in interest status is merely illustrative and the party in interest concept has been broadly interpreted to include those persons having a stake in the outcome of the bankruptcy case or a right at issue in a particular proceeding.").

Section II.A.2.[113]   Molner could have filed a motion seeking to dismiss the Chapter 11 Cases "for

cause" under section 1112(b)(1) of the Bankruptcy Code or objected to confirmation of the Plan

if (as he alleges) the Chapter 11 Cases were part of a scheme to defraud him.[114]   But Molner and

his entities never did so nor otherwise raised any such concerns in the Bankruptcy Court.

      (2)     Notices of objection deadlines, motions, hearings, and reports were served on

Molner regarding the matters he now complains about in the State Action, including: (a) the

Debtors' rejection of the ARP Services Agreement; (b) Reed Smith's applications for the

Bankruptcy Court's approval of its compensation, including its ***final*** fee application; (c) the

Debtors' motion for approval of the Disclosure Statement; (d) the Debtors' motion requesting

confirmation of the Plan; and (e) annual reports of the Distribution Trust disclosing all

compensation paid to the Distribution Trustees and Reed Smith pursuant to the Plan and

Distribution Trust Agreement.  *See supra* Sections II.A.3-7.  Other materials were also publicly

filed in the Chapter 11 Cases and disclosed to Molner and his entities, including the monthly

operating reports filed by the Debtors disclosing all compensation paid to the JVLs and the

monthly fee statements filed by Reed Smith.  *See supra* Section II.A.3.

      (3)     Molner was an active participant in the Chapter 11 Cases.  Molner and/or his

counsel appeared on the record in at least five hearings in the Bankruptcy Court,[115] and Molner

submitted or was a party to more than ten filings in the Chapter 11 Cases (some including a

---

[113]   *See* Bk. Dkt. No. 13; Summons at 6.

[114]   *See In re HBA E., Inc.*, 87 B.R. 248, 258-60 (Bankr. E.D.N.Y. 1988) ("[I]nherent in the statute and clearly
inferred in 11 U.S.C. § 1112(b) is the requirement of good faith on the part of a debtor to file and maintain a
Chapter 11 case.  This implicit good faith Chapter 11 prerequisite has been consistently upheld by the courts.
. . .  An important factor to consider in determining whether a Chapter 11 case was initiated in good faith is
whether the reorganization effort essentially involves a two-party dispute which can be resolved in a non-
bankruptcy forum. . . .  Chapter 11 was never intended to be used as a fist in a two party bout.  The Chapter is
entitled reorganization and not litigation.").

[115]   *See* Bk. Dkt. Nos. 717 (Tr. Feb. 9, 2017), 760 (Tr. Apr. 13, 2016), 951 (Tr. Feb. 28, 2018), 968 (Tr. Sept. 24,
2018), 991 (Tr. Oct. 30, 2018).

declaration or affidavit by Molner)[116] regarding various matters.  Those matters include: (a) the proofs of claim filed by Molner and his entities; (b) a reservation of rights regarding Molner's purported indemnification rights relating to the Molner Litigation Campaign; (c) a dispute with David Bergstein; (d) Molner's motion requesting to adjudicate his right to payment of his legal expenses in the Arbitration; and (e) Molner's motion to dissolve the protective order to serve subpoenas on Distribution Trust representatives.  *See supra* Sections II.A.5, II.A.8-9.

(4)     Molner repeatedly raised in the Bankruptcy Court the same issues that he now raises in the State Action (despite failing to raise such issues in a motion or objection at the appropriate time), including that: (a) he supposedly was blindsided by the commencement of the Chapter 11 Cases and the Debtors' rejection of the ARP Services Agreement; and (b) Reed Smith allegedly had (i) owed him a fiduciary duty at some point, (ii) supported the Molner Litigation Campaign, (iii) charged excessive compensation to Aramid, and (iv) conducted an investigation that cleared him of any wrongdoing alleged by Wimbledon.  *See supra* Sections II.A.5, II.A.8-9.[117]  The Bankruptcy Court required Molner to "file a motion" if he wished to properly raise such issues in the Bankruptcy Court, yet Molner and his entities chose not to do so.  *See supra* Section II.A.8.

74.     The State Action also relates to the Chapter 11 Cases with respect to the Trust Affidavit that the Bankruptcy Court ordered the Distribution Trust to provide to Molner in September 2018.  The Trust Affidavit addresses many of the same issues that are the subject of the State Action, including the circumstances leading to the commencement of the Chapter 11 Cases and rejection of the ARP Services Agreement.  *See supra* Sections II.A.9.

---

[116] *See* Bk. Dkt. Nos. 174, 573, 626, 644-45, 665, 834, 839, 932, 972, 1015.

[117] *See* Bk. Dkt. No. 644 at 20-21; Bk. Dkt. No. 645 at 7-9; Bk. Dkt. No. 932 at 8, 10-12; Bk. Dkt. No. 951 at 6:16-8:6, 10:17-21, 11:21-23; Bk. Dkt. No. 968 at 16:3-22, 17:15-18:1.

**E.      The State Action Requires Federal Adjudication Of Whether Molner's Claims Are Barred Or Otherwise Affected By The Proofs of Claim Filed By Molner, ACP And ARP**

75.      The State Action is duplicative of the proofs of claim filed by Molner and his entities in the Chapter 11 Cases because: (1) each claim requested legal fees that were owed or may become owed "relating to [Molner and his entities' respective] involvement with . . . these Chapter 11 Cases"; and (2) the ARP Claim requested more than $1 million in compensation that was purportedly owed to ARP during the Chapter 11 Cases.[118]  *See supra* Section II.A.5.  On February 28, 2018, the Bankruptcy Court denied Molner's motion to litigate outside the Bankruptcy Court whether he was entitled to payment of his legal fees.  *See supra* Section II.A.8. Then, on June 8, 2020, pursuant to the settlement reached in the Arbitration, the Bankruptcy Court approved the expungement of the Molner Claim and the ACP Claim with prejudice.  *See supra* Section II.A.10.  The ARP Claim remains a disputed claim in the Chapter 11 Cases.

76.      Thus, the Summons seeks from the Debtors' professionals:

(1)      the same legal expenses that (a) Molner and ACP voluntarily relinquished in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court, (b) Molner argued were "inextricably linked" to the Arbitration and his proofs of claim,[119] and (c) the Bankruptcy Court did not permit to be litigated outside the Bankruptcy Court; and

(2)      the same legal expenses and compensation that ARP is currently seeking in the Bankruptcy Court.

77.      The State Action is thus related to and arises in the Chapter 11 Cases because it is a "continued attempt . . . to recover [legal expenses and compensation] originally claimed from the estate" pursuant to proofs of claim filed by Molner and his entities in the Chapter 11 Cases.

---

[118]   Bk. Dkt. Claim Nos. 41-42, 44; *see* Summons at 6.
[119]   Bk. Dkt. No. 932 at 4.

*See In re Petrie Retail*, 304 F.3d at 230 (holding bankruptcy court had "arising in" jurisdiction over a dispute between a landlord and the party that acquired the debtor's lease pursuant to a sale approved by the bankruptcy court in part because "the dispute . . . involved an issue already before the bankruptcy court as part of its consideration of [the landlord's proof of claim] against the estate" and "was thus a continued attempt by [the landlord] to recover rent originally claimed from the estate"); *In re Sterling Optical Corp.*, 302 B.R. at 803 (holding bankruptcy court had "arising in" and "related to" jurisdiction over lawsuit because "[t]he matters raised by the proof of claim [filed by the plaintiff in a bankruptcy case], and the objection thereto, substantially, if not totally, overlapped with the issues for determination" in the lawsuit).

78.    Additionally, the State Action requires adjudication of whether Molner's claims are barred or otherwise affected (*e.g.*, pursuant to the federal doctrines of collateral attack, waiver and estoppel) by: (1) the Bankruptcy Court's ruling that Molner's claimed legal expenses must be adjudicated by the Bankruptcy Court; (2) the good faith Order; (3) the Expungement Order; and (4) the disputed ARP Claim.

**F.    The State Action Has A "Close Nexus" To The Chapter 11 Cases, And The Bankruptcy Court Expressly Retained "Exclusive Jurisdiction" To Adjudicate The Issues Presented In The State Action**

79.    It is well established that "[a] bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders." *In re Petrie Retail*, 304 F.3d at 229-31.[120] In addition, federal bankruptcy jurisdiction exists post-confirmation so long as a matter or dispute has a "close nexus to the bankruptcy plan or proceeding" and the plan provides for the

---

[120]    *See also In re G+G Retail, Inc.*, 2010 WL 743918, at *1 (Bankr. S.D.N.Y. Feb. 24, 2010) (same); *Rahl v. Bande*, 316 B.R. 127, 133 (S.D.N.Y. 2004) (same); *In re Gen. Media, Inc.*, 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005) ("'when a matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan or incorporated litigation trust agreement,'" it has a "'close nexus to the bankruptcy plan or proceeding'" (quoting *In re Resorts Int'l, Inc.*, 372 F.3d 154, 168-69 (3d Cir. 2004))).

retention of jurisdiction.  *In re Kassover,* 336 B.R. at 79.  In fact, there is an even stronger basis for post-confirmation jurisdiction in the case of a "liquidating plan of reorganization" (*e.g.*, where the debtor ceases to do business and its assets are liquidated) such as the Plan here.  *See In re Refco, Inc. Sec. Litig.,* 628 F. Supp. 2d at 442 (following *Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr., Inc.),* 410 F.3d 100, 106-07 (1st Cir. 2005)); *In re Cross Media Mktg. Corp.*, 367 B.R. 435, 444 (Bankr. S.D.N.Y. 2007) (same).

80.    The State Action has a "close nexus" to the Chapter 11 Cases for all of the reasons discussed above.  Thus, the State Action:

(1)    pertains to events that occurred in the Chapter 11 Cases, including (a) commencement of the Chapter 11 Cases, (b) court-approved rejection of the ARP Services Agreement, (c) court-approved compensation paid to the JVLs, Distribution Trustees, and Reed Smith, and (d) legal expenses incurred by Molner and his entities during the Chapter 11 Cases;

(2)    requires the interpretation and enforcement of the Plan, Confirmation Order, and numerous other orders of the Bankruptcy Court;

(3)    requires federal adjudication of issues based on events that occurred in the Chapter 11 Cases (*e.g.*, collateral attack, waiver, and estoppel); and

(4)    is duplicative of the proofs of claim filed by Molner, ACP, and ARP that the Bankruptcy Court held must be adjudicated in the Bankruptcy Court, and were either expunged or remain pending in the Chapter 11 Cases.

81.    Two additional grounds establish a "close nexus" to the Chapter 11 Cases:

(1)    the State Action pertains to the same or substantially similar issues as the Adversary Proceeding and the Arbitration, as each involves the rights or liabilities of Molner and his entities arising from Molner's previous management of Aramid, *see supra* Section II.A.5; and

47

(2)      the State Action implicates indemnification rights of the Distribution Trustees and

Reed Smith under the Distribution Trust Agreement and hence its concomitant impact on the

Distribution Trust.  *See supra* Section II.A.6.[121]

82.     Finally, the nexus exists because the Bankruptcy Court expressly retained

exclusive jurisdiction to adjudicate the issues identified above that are presented by the State

Action.  The Confirmation Order states, "[p]ursuant to sections 105(a) and 1142 of the

Bankruptcy Code, this Court shall retain ***exclusive jurisdiction*** with respect to all matters arising

from or related to the Chapter 11 Cases, the Plan, and the implementation of this Confirmation

Order, including, without limitation, those matters set forth in Article VIII of the Plan."[122]

In addition, the Distribution Trust Agreement approved by the Bankruptcy Court states, "[t]he

Bankruptcy Court shall have ***exclusive jurisdiction*** over any dispute arising out of or in

connection with the transactions or services contemplated by this Distribution Trust

Agreement."[123]

---

[121]  *See In re AOG Entm't, Inc.*, 569 B.R. 563, 578 (Bankr. S.D.N.Y. 2017) ("Courts addressing the question have concluded that an indemnification claim triggered by a post-confirmation lawsuit that is payable from the assets available for distribution to the creditors under the plan bears a 'close nexus' to the plan and satisfies requirements for post-consummation, 'related to' jurisdiction."); *Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*, 2011 WL 4965150, at *4 (S.D.N.Y. Oct. 19, 2011) (same).

[122]  Bk. Dkt. No. 710 at 43 (emphasis added).  Article VIII of the Plan provides that, "[n]otwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date to the full extent legally permissible," including jurisdiction to: (1) "[i]ssue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order"; (2) "[r]esolve any matters related to the . . . rejection of any Executory Contract," such as the ARP Services Agreement; (3) "[d]ecide or resolve any . . . litigated matters and any other matters . . . involving any Debtor or Estate that may be pending on the Effective Date or brought thereafter"; (4) "[e]nforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases"; (5) "[e]nter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and . . . the Distribution Trust Agreement"; (6) "[r]esolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or . . . the Distribution Trust Agreement"; (7) "[d]etermine any other matters that may arise in connection with or relate to the Plan"; and (8) "[h]ear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules."  *Id.* at 97-98.

[123]  *Id.* at 130-31 (emphasis added).

\*      \*      \*

In sum, removal of the State Action is appropriate pursuant to 28 U.S.C. §§ 1452(a) and 1334(b) because the State Action is related to and also arises from the Chapter 11 Cases for each of the reasons stated above.

## IV.   CONSENT TO ENTRY OF FINAL ORDERS

83.     To the extent that the removed State Action is a non-core proceeding, Reed Smith consents, pursuant to Bankruptcy Rule 9027(a)(1), to the entry of a final order or judgment by a bankruptcy judge.

## V.   PROCESS AND PLEADINGS IN THE STATE ACTION

84.     As required by 28 U.S.C. § 1446(a) and Bankruptcy Rule 9027(a), a copy of the docket sheet and copies of all process and pleadings filed or served in the State Action, including the Summons, are attached hereto.  *See* **Exhibit 2** (Summons); **Exhibit 3** (docket sheet); **Exhibit 4** (Proof of Service regarding Reed Smith); **Exhibit 5** (Proofs of Service regarding non-removing defendants).

## VI.   THE NOTICE OF REMOVAL IS TIMELY

85.     Molner's Proof of Service states that the Summons was served on Reed Smith on October 6, 2020.[124]  This Notice of Removal is therefore timely pursuant to 28 U.S.C. § 1446(b) and Bankruptcy Rule 9027 because it is filed within thirty (30) days thereafter.  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344 (1999) (holding that the 30-day removal period began to run from the date of formal service).

---

[124]   *See supra* n.2.

## VII.   REMOVAL BASED ON THE SUMMONS IS APPROPRIATE

86.   Removal of the State Action based on the Summons is appropriate, even though no complaint has been served on Reed Smith, because the Summons identifies Molner's claims against Reed Smith and sets forth the purported basis for such claims, and the facts giving rise to removability of the State Action and federal jurisdiction are evident from the Summons.  *See Moltner v. Starbucks Coffee Co.*, 624 F.3d 34 (2d Cir. 2010) (summons with notice triggers period for removal if the basis for removability is evident); *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 205-06 (2d Cir. 2001) (same); *In re Fairfield Sentry Ltd.*, 452 B.R. 64, 89 (Bankr. S.D.N.Y.) (same), *rev'd on different grounds sub nom. In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665 (S.D.N.Y. 2011); *Gutierrez v. Home Depot U.S.A., Inc.*, 2003 WL 22801808, at *1 (S.D.N.Y. Nov. 26, 2003) (same); *Savino v. Gowing*, 2003 WL 21730177, at *2 (W.D.N.Y. July 1, 2003) (same).

## VIII.   VENUE IS APPROPRIATE

87.   This Court is the appropriate Court to which the State Action should be removed under 28 U.S.C. § 1452(a) because this Court is the United States District Court for the district where the State Action is pending pursuant to 28 U.S.C. § 112(b), and this is also the district where the Chapter 11 Cases are pending in the Bankruptcy Court.

## IX.   NOTICE TO ALL PARTIES AND THE STATE COURT

88.   Pursuant to 28 U.S.C. § 1446(d) and Bankruptcy Rule 9027(b)-(c), promptly after filing this Notice of Removal, Reed Smith will serve a copy of the Notice of Removal on all counsel of record in the State Action and file a copy with the clerk of the state court overseeing the State Action.

## X.   RESERVATION OF RIGHTS

89.      Reed Smith reserves the right to submit different or additional allegations,

arguments, and evidence in support of this Notice of Removal to the extent necessary.

WHEREFORE, Reed Smith hereby removes the State Action to the United States District

Court for the Southern District of New York and respectfully requests that the State Action be

referred to the Honorable Sean H. Lane of the United States Bankruptcy Court for the Southern

District of New York pursuant to the Standing Order.


Dated: New York, New York
        October 20, 2020

                                          Respectfully submitted,

                                          **GIBSON, DUNN & CRUTCHER LLP**


                                          By:  /s/ Nancy Hart
                                               Nancy Hart
                                               David M. Feldman
                                               200 Park Avenue
                                               New York, NY 10166-0193
                                               Telephone:  212.351.4000
                                               Facsimile:  212.351.4035
                                               NHart@gibsondunn.com
                                               DFeldman@gibsondunn.com

                                               Kevin S. Rosen (*pro hac vice* request to
                                               be promptly submitted)
                                               333 South Grand Avenue
                                               Los Angeles, CA 90071-3197
                                               Telephone:  213.229.7000
                                               Facsimile:  213.229.6635
                                               KRosen@gibsondunn.com

                                               *Attorneys for Reed Smith LLP*

103999802

51